IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-00355-FL

| | |
|---|---|
| JAWAL SULEMAN, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM** |
| v. ) | **AND RECOMMENDATION** |
| ) | |
| ERIK K. SHINSEKI, *Secretary of* ) | |
| *Veterans Affairs*, UNITED STATES ) | |
| DEPARTMENT OF VETERANS ) | |
| AFFAIRS, ELIZABETH GOOLSBY, ) | |
| *Director, Fayetteville VA Medical Center*, ) | |
| FAYETTEVILLE VA MEDICAL ) | |
| CENTER, and JOHN/JANE DOE, *Chief* ) | |
| *Patient Care Services Officer, Fayetteville* ) | |
| *North Carolina VA Medical Center*, ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court on Defendants' Motion to Dismiss [DE-20]. Plaintiff has responded and Defendants have replied. Accordingly, the matter is ripe for review and Chief Judge Flanagan has referred it to the undersigned Magistrate Judge for a memorandum and recommendation.

## STATEMENT OF THE CASE

On September 2, 2010, Jawal Suleman, M.D. ("Plaintiff") filed a Complaint [DE-2] against (1) Erik K. Shinseki, Secretary of Veterans Affairs; (2) the United States Department of Veterans Affairs ("the VA"); (3) Elizabeth Goolsby, Director, Fayetteville VA Medical Center; (4) the Fayetteville VA Medical Center ("the FVAMC"); and (5) John/Jane Doe, Chief Patient Care Services Officer, Fayetteville North Carolina VA Medical Center (collectively

"Defendants"). In his complaint, Plaintiff requested review of an agency action and sought declaratory and injunctive relief.

In lieu of an answer, Defendants filed a Motion to Dismiss [DE-20] on October 12, 2010, which sought dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Plaintiff filed a Response [DE-22] on November 15, 2010. Defendants filed a Reply [DE-23] on December 17, 2010.

## STATEMENT OF FACTS

Exclusively for purposes of the motion to dismiss, Defendants do not dispute the facts as set out in Plaintiff's complaint. Memo. in Supp. at 1 [DE-21]. Therefore, the Court considers the pertinent facts to be as follows:

Plaintiff is a licensed cardiologist who, from 2001 to 2006, was employed by the FVAMC. Compl. ¶ 4 [DE-1]. Defendants are the FVAMC, the VA itself, and related authorities within both entities. *Id.* ¶¶ 6-10. The National Practitioner Data Bank (hereinafter "the NPDB") is a data bank maintained by the United States Department of Health and Human Services (hereinafter "the DHHS") which permanently stores and reports professional review and malpractice data concerning physicians. *Id.* ¶ 5. Notably, payments for the benefit of a physician which are made pursuant to a medical malpractice claim must be reported to the NPDB. *Id.* ¶ 11. The VA's participation in the NPDB and the method by which these reports are made were established pursuant to the Health Care Quality Improvement Act of 1986 (hereinafter "the HCQIA"). *Id.* ¶¶ 12-14; *see also* 42 U.S.C. § 11152(b).

At approximately 7:30 p.m. on June 11, 2002, a 77-year old veteran (hereinafter "C.L.") came to the FVAMC complaining of various symptoms. He was seen in the outpatient clinic, diagnosed with a hernia, and recommended for urgent surgical repair. Compl. ¶ 16. Plaintiff did

2

Case 5:10-cv-00355-FL   Document 24   Filed 04/19/11   Page 2 of 19

not examine C.L. at any time but, though the facts are somewhat unclear, it does appear that Plaintiff was on call that night and may have ordered that a dose of Percocet be given to C.L. at some point. However, it also appears that the nursing staff of the FVAMC provided C.L. with up to three additional doses of Percocet over the next several hours without proper authority. *Id.* ¶¶ 17-27. At 4:15 a.m., C.L. expired. The cause of death was later determined to be small bowel infarction and associated electrolyte imbalance. *Id.* ¶¶ 29-30. The implication appears to be that the combined doses of Percocet contributed to C.L.'s death.

On February 13, 2004, a federal tort claim was filed against the nursing staff at the FVAMC by the personal representative of C.L.'s estate. *Id.* ¶ 32. No allegations of negligence were made against any physician, including Plaintiff. *Id.* ¶ 34. Nonetheless, Plaintiff was identified by the FVAMC risk manager as a co-participant in C.L.'s care. Plaintiff was notified but, unable to provide any information about the event, was not contacted again regarding the matter for over two years. *Id.* ¶ 35-36.

The tort claim by C.L.'s estate against the nursing staff was settled on December 19, 2006. *Id.* ¶ 40. Plaintiff, who had left his employment at the FVAMC on July 17, 2006, was notified of the settlement on May 8, 2007 and told that he might be reported to the NPDB since he had been identified as a co-participant in C.L.'s care. *Id.* ¶¶ 39, 41. Plaintiff replied to the FVAMC risk manager on May 31, 2007 and pointed out that his participation was extremely limited and there was a lack of evidence in the medical record to support his involvement. *Id.* ¶ 47. To this end, Plaintiff appears to dispute that any payment was made on his behalf which would require him to be reported to the NPDB.

After he voiced his concern to the FVAMC risk manager, the extent of Plaintiff's participation was examined by a review panel within the Office of Medical-Legal Affairs of the

3

VA. On October 29, 2007, the director of the Office of Medical-Legal Affairs informed the FVAMC of the review panel's conclusion and on November 8, 2007, the FVAMC communicated to Plaintiff that the review panel had found that Plaintiff had engaged in substandard care and would be reported to the NPDB for not evaluating C.L. and for ordering an excessive dose of Percocet. *Id.* ¶¶ 48-49. For the next several years, Plaintiff attempted to gain access to the medical record used by the review panel, and on March 4, 2010 was provided with a limited subset of the record. *Id.* ¶ 51. Plaintiff contends that he should have had access to the full medical record.

On May 13, 2010, Plaintiff submitted his position on the matter directly to the Office of Medical-Legal Affairs, complaining of a denial of his due process rights, errors in the medical record supplied, and a lack of a reasonable basis for the review panel to conclude that Plaintiff had done or failed to do anything that led to substandard care. *Id.* ¶ 55. On August 3, 2010, the decision of the review board was reaffirmed and Plaintiff was once again informed, via the FVAMC, that he would be reported to the NPDB. *Id.* ¶ 56.

Upon receiving this notice, Plaintiff informed the Office of the United States Attorney for the Eastern District of North Carolina that he intended to seek an order restraining the VA's issuance of the proposed report to the NPDB. Plaintiff subsequently learned that the FVAMC intended to submit the NPDB report regarding Plaintiff on September 2, 2010. *Id.* ¶ 58. As a result, on September 2, 2010, Plaintiff filed the complaint in the instant action as well as an Emergency Motion for Preliminary Injunction and Emergency Motion for Temporary Restraining Order [DE-4], which sought to enjoin Defendants from sending the report regarding Plaintiff to the NPDB pending resolution of the action. The same day, Chief Judge Flanagan

4

issued an Order [DE-14] denying Plaintiff's motion for temporary restraining order for failure to satisfy the Rule 65(b)(1) requirements.

Generally, Plaintiff's complaint seeks judicial review of an agency action, namely the actions of Defendants collectively proceeding as the VA. Specifically, Plaintiff claims that Defendants' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] misconstrue the provisions of the HCQIA . . . in finding him to be a practitioner for whose benefit a malpractice payment was made, and in expressly denying plaintiff a fair in-person or due process hearing or procedure, and in expressly denying him access to the complete medical and other records." *Id.* ¶¶ 66-67. Plaintiff prays that the Court require Defendants to provide him with the entire medical record, find their actions to have been in violation of Plaintiff's due process rights and the HCQIA, and prevent Defendants from filing a report concerning Plaintiff's participation in C.L.'s care with the NPDB. *Id.* ¶ 68.

## STANDARD OF REVIEW

Pursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The existence of subject matter jurisdiction is a threshold question that a court must address before considering the merits of the case. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). When confronted with a Rule 12(b)(1) motion to dismiss, the plaintiff, as the party opposing the motion, has the burden of proving that subject matter jurisdiction does in fact exist. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

## DISCUSSION

In their motion to dismiss, Defendants make two overarching arguments. First, Defendants argue that Plaintiff cannot seek judicial review in this Court because he has failed to

establish waiver of sovereign immunity under the Administrative Procedures Act (hereinafter "the APA"). Second, Defendants argue that Plaintiff has failed to show standing to sue. Each of these arguments will be addressed in turn.

### 1. Waiver of sovereign immunity under the APA

The issue of whether sovereign immunity has been waived is a jurisdictional one, and thus is properly raised via a Rule 12(b)(1) challenge to subject matter jurisdiction. *See Medina v. United States*, 259 F.3d 220, 223-24 (4th Cir. 2001); *Frye v. Brunswick County Bd. of Educ.*, 612 F. Supp. 2d 694, 700 (E.D.N.C. 2009).

The APA operates to waive sovereign immunity and authorize judicial review of agency action when either: (1) a statute specifically grants a private right of action; or (2) a statute is silent but a plaintiff shows *both* that there has been final agency action and that there is no other adequate judicial remedy. *See* 5 U.S.C. § 704. Here, the parties appear to agree that the relevant statute, the HCQIA, does not grant a private right of action and thus direct their arguments towards the second of these avenues for judicial review.[1] To that end, Defendants argue both that there has been no final agency action and that the HCQIA provides Plaintiff with another adequate judicial remedy. In response, Plaintiff argues both that there has been final agency action and that he has no other adequate judicial remedy.

### a. Final agency action

Defendants argue that, as per the HCQIA's NPDB reporting scheme, there will not have been final agency action in this case until Plaintiff has filed a dispute regarding the accuracy of

---

[1] Defendants do briefly argue that Plaintiff has failed to establish subject matter jurisdiction because (1) 28 U.S.C. § 1331 does not create jurisdiction in and of itself and the HCQIA does not create a private action; and (2) the APA does not grant jurisdiction in and of itself. However, Plaintiff does not dispute either of these contentions and focuses instead on his belief that he has established a valid cause of action under the APA.

6

Case 5:10-cv-00355-FL Document 24 Filed 04/19/11 Page 6 of 19

the NPDB report with the Secretary of the DHHS and the DHHS has ruled on the dispute.[2] Therefore, they contend that submission of the NPDB report by the VA itself is an interlocutory step and does not constitute final agency action under the APA.

In response, Plaintiff argues that Defendants' argument necessarily conflates the VA and the DHHS into one agency for purposes of deciding whether the VA's action is final and that, as a result, Defendants incorrectly "assert that the possibility of relief from another agency in the future deprives the VA's wrongful actions of their finality." Memo. in Opp'n at 6 [DE-22]. Similarly, Plaintiff contends that the possibility that the DHHS might order the report to be removed from the NPDB in the future does not detract from the finality of the VA's action in submitting the report, which has already occurred.

The parties do not dispute that a decision by the DHHS on the accuracy of an NPDB report is final and that there would be final agency action subject to judicial review if Plaintiff had initiated a grievance and then filed suit against DHHS subsequent to receiving its decision. Rather, the question is whether the VA's submission of the report *also* constitutes a final agency action subject to judicial review. Defendants cite *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir. 2002) for the relevant standard of review on this matter. In *Flue-Cured*, the Fourth Circuit adopted the following two prong test:

> [T]wo conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

---

[2] Regulations promulgated under authority of the HCQIA provide a procedure by which a health care practitioner may dispute the accuracy of information in the NPDB by filing an appeal with the DHHS. Specifically, "[a]ny physician . . . may dispute the accuracy of information in the NPDB concerning himself . . . within 60 days from the date on which the Secretary mails the report to the subject individual." 45 C.F.R. § 60.16(a)-(b).

7

313 F.3d at 858 (quoting *Bennett v. Spears*, 520 U.S. 154, 177-78 (1997)). For all practical purposes, the parties agree that the *Flue-Cured* framework is the appropriate approach to analyzing this issue.[3] Accordingly, the Court will analyze each prong in turn.

### i. Consummation of the agency's decision-making process

Defendants contend that the submission of the NPDB report by the VA was an interlocutory step and not the consummation of an agency decision-making process. Rather, Defendants argue that the agency decision-making process cannot be complete until after Plaintiff has filed a dispute with the DHHS and received a decision. In addition, Defendants contend that allowing Plaintiff to appeal the submission of the NPDB report by the VA would give him a "better deal" than a physician who sought to appeal the submission of a report filed by a private hospital, simply because the reporting entity involved happened to itself be a federal agency.

In response, Plaintiff argues that the VA, through the FVAMC, told Plaintiff on August 3, 2010 that he would be reported to the NPDB and that he was not given any further opportunity for review of that decision by the VA. Plaintiff also argues that the fact that he had the ability to go to a different federal agency, the DHHS, and engage in some form of a dispute process there, does not change the finality of the VA's submission of the NPDB report. Therefore, Plaintiff contends that the August 3, 2010 notice was the VA's last act prior to submission of the NPDB report and thus constitutes final agency action for purposes of APA judicial review. In response to Defendants' contention that he seeks a "better deal" by virtue of the fact that he happened to have worked for the VA, Plaintiff argues that, because he was not personally named in the

---

[3] Plaintiff has superficially attempted to dispute Defendants' use of the *Flue-Cured* framework. *See* Memo. in Opp'n at 6 ("Without conceding the applicability of *Flue-Cured* to his case, plaintiff will examine the *Flue-Cured* factors.") However, Plaintiff cites no other case and the Court independently finds *Flue-Cured* to be the relevant law in the Fourth Circuit on the issue.

8

underlying malpractice suit by C.L.'s estate, the VA impermissibly reported him in violation of NPDB regulations that prevent submission of reports for un-named physicians in the first place. This, he contends, subjects him to a different statutory construction than a physician who worked at a non-VA hospital, and negates the "better deal" argument.[4]

In their reply, Defendants address Plaintiff's response by pointing out that, by Plaintiff's logic, no federal physician would ever be reported to the NPDB because federal tort claims preclude naming individual providers and, instead, it is the VA that identifies the providers for whose benefit it makes a payment for purposes of NPDB reports. *See* Memorandum of Understanding, Reply Ex. 1 [DE-23-1]. Defendants also point out that, if Plaintiff had worked for a private hospital, he probably *would* have been named in the suit filed by C.L.'s estate because malpractice claims against non-federal agencies tend to be filed using a "buckshot approach." Reply at 8 [DE-23].

Here, the Court finds Plaintiff's theory—that submission of the NPDB report by the VA was the final action taken by the VA itself and thus a final agency action—to be an attractive one on its face. It is in fact true that a federal agency has issued its final decision on the matter. However, Defendants are correct that the final decision of the VA is not the relevant agency decision for purposes of judicial review. Rather, the decision of the VA to submit a NPDB report is merely an interlocutory step. After a NPDB report is submitted, *no matter by whom*, a practitioner must dispute the accuracy of the report with the DHHS and await resolution of that dispute before there has been "consummation" of an agency decision-making process subject to judicial review. Several other federal courts have considered similar questions and held that a

---

[4] Plaintiff points out that the NPDB Guidebook mandates that practitioners outside the VA system cannot be named in a NPDB report unless they are personally named in the malpractice suit, and that, accordingly, because he was not named in the suit filed by C.L.'s estate, no hospital besides one operated by the VA could have reported him to the NPDB. Memo. in Opp'n at 12.

9

Case 5:10-cv-00355-FL   Document 24   Filed 04/19/11   Page 9 of 19

plaintiff seeking injunctive relief must first exhaust the administrative remedies provided by the HCQIA before a court may exercise jurisdiction. *See, e.g., Gonino v. Private Health Care Sys., Inc.*, 2004 WL 2583625, at *2 (N.D. Tex. Nov. 12, 2004) (Though the HCQIA regulation did not "specifically provide that the administrative remedy must first be exhausted, such a requirement complies with the general purposes of requirement of exhaustion of administrative remedies," and, because the plaintiff had failed to submit that he had exhausted the administrative remedies provided by the HCQIA regulation, the court found it lacked jurisdiction over plaintiff's claim for injunctive relief.); *Brown v. Med. Coll. of Ohio*, 79 F. Supp. 2d 840, 845 (N.D. Ohio 1999) ("Allowing a physician to bypass the administrative procedure simply by choosing to sue the reporting entity could 'induce frequent and deliberative flouting of administrative processes, thereby undermining the scheme of decisionmaking that Congress has created' under the HCQIA.); *Anbar v. Leahan*, 1998 WL 314691, at *7-8 (E.D. Pa. June 11, 1998) ("[T]he record is devoid of evidence that plaintiff took any steps under the available administrative procedures to dispute the accuracy of the report . . . submitted to the Data Bank. . . . Thus, because plaintiff has not exhausted his administrative remedies, this court lacks jurisdiction to provide injunctive relief at this juncture."); *Bigman v. Med. Liab. Mut. Ins. Co.*, 1996 WL 79330, at *4 (S.D.N.Y. Feb. 22, 1996) ("Allowing plaintiff to bypass [administrative] procedure simply by choosing to sue the reporting entity directly would be contrary to the obvious intent of the drafters of the governing regulations. . . . Therefore, the administrative remedial procedure set forth in 45 C.F.R. § 60.14 must be completed before a civil suit against the reporting entity is commenced").

The Court is led in part to this conclusion by Defendants' astute observation that Plaintiff seeks a "better deal" simply by virtue of the fact that the NPDB report in question happened to have been proffered by the VA. It is true that the fact that the hospital in the instant case was

itself acting on behalf of a federal agency muddies the water somewhat. However, nonetheless, if Plaintiff's position were correct, he would receive interlocutory review of the VA's submission of the report while a physician who worked for Duke University Medical Center would not be able to seek review of a NPDB report at this stage because Duke University Medical Center is not a federal agency and any NPDB report which it filed could not conceivably be agency action. Such a physician would clearly have to appeal to the DHHS and wait for the resolution of the dispute before judicial review of an agency action would be an available remedy. Plaintiff has cited no authority for differentiating between physicians that happen to work for the VA and those that do not. Thus, the Court finds that creating an arbitrary distinction between VA and non-VA physicians would conflict with the purposes of the NPDB, the HCQIA, and the mechanism of judicial review of final agency decisions generally. In response to Plaintiff's counter-argument that he is not seeking a "better deal" because he is subject to a different statutory scheme, the Court simply notes that Defendants are also correct that this, if it were true, would effectively preclude any federally-employed physician from ever being reported and is clearly contrary to the intent of the NPDB itself. Accordingly, the Court finds that Plaintiff has not established that the VA's filing of the NPDB report was the consummation of an agency decision-making process.

Under the *Flue-Cured* framework, failure to establish that an agency action is *both* the consummation of an agency process and an action by which rights or obligations have been determined requires the Court to find that Plaintiff has not established final agency action in this case. However, it does appear from references in the parties' briefs that the NPDB report was filed by the VA after Plaintiff's motion for temporary restraining order was denied and that Plaintiff did in fact initiate a dispute as to the accuracy of the report with the DHHS at some

point thereafter. *See, e.g.*, Reply at 2. Neither party has provided further information as to the status of the DHHS dispute; however, in light of the situation, the Court will assume that it will at some point become final and move on to address the second prong of the *Flue-Cured* framework. However, the Court does note that, to the extent the DHHS dispute becomes final and Plaintiff seeks to argue that final agency action has occurred at that juncture, Plaintiff's appropriate recourse would be to initiate suit against the DHHS directly.

### ii. Action by which rights and obligations have been determined

Defendants argue that the VA's submission of the NPDB report did not create any direct or appreciable legal rights or consequences. In addition, Defendants point out that, as a matter of fact, the HCQIA actually *proscribes* legal rights or consequences flowing from a report filed with the NPDB, because it provides that payment in settlement of medical malpractice claim may not be construed to create a presumption that malpractice occurred. *See* 42 U.S.C. § 11137(d). Rather, Defendants contend that the NPDB report is merely a way to put employers on notice of prior incompetence. *See Leal v. DHHS*, 2010 WL 3667020, at *2 (11th Cir. Sept. 22, 2010). Defendants point out that Plaintiff's clinical privileges were renewed twice by the VA after the death of C.L., that he subsequently voluntarily left his employment at the FVAMC, and that he was offered and accepted employment at another VA hospital subsequent to the VA review panel's decision that he was a co-participant in C.L.'s care. Therefore, Defendants argue that "Plaintiff did not lose employment or clinical privileges and, after voluntarily leaving VA employment, was re-hired by the VA even after the VA determined that he should be reported to the NPDB." Memo. Supp. Mot. Dismiss at 20. To that end, Defendants argue that any potential future harm to his professional reputation that Plaintiff complains of is merely speculative and, were it to occur, would result not from any action of the VA but from the decisions of third

parties who chose to rely on the advisory NPDB report. Citing *Flue-Cured*, Defendants argue that any such third party-generated negative consequences are insufficient to convert the VA's submission of the NPDB report into final agency action.

In response, Plaintiff attempts to distinguish *Flue-Cured* by arguing that the NPDB report in this case places greater pressure on potential third parties than the report at issue there, and that "[t]he fact that the licensors could be technically called third parties should not minimize the legal consequences that could flow, and be required to flow, from their receipt of the report. . . . the medical equivalent of a Scarlett [sic] A." Memo. in Opp'n at 8.

In their reply, Defendants simply note again that the HCQIA specifically prohibits a presumption of malpractice from being created, that third parties are free to make up their own minds, and that the logic of *Flue-Cured* specifically dictates that the fact that a third party might choose to rely on a report does not, in and of itself, make submission of that report final agency action. Accordingly, because the parties evidently disagree as to its applicability, the Court finds that an overview of the *Flue-Cured* opinion is appropriate at this juncture.

*Flue-Cured* involved the Radon Act, which required the Environmental Protection Agency (hereinafter "the EPA") to establish a research program on air quality and to disseminate its findings to the public. 313 F.3d at 855-56. Pursuant to the Radon Act, the EPA issued a report analyzing the effects of secondhand smoke on human health, and the plaintiffs—tobacco companies and lobbying groups—filed a complaint challenging the legality of the report on a number of fronts. *Id.* at 856. The EPA filed a motion to dismiss and argued that the court lacked jurisdiction because the report was not reviewable final agency action. *Id.* This motion was denied by the district court; however, on appeal, the Fourth Circuit agreed with the EPA and reversed. *Id.* at 858.

The parties in *Flue-Cured* did not dispute that the report marked the consummation of the agency's decision-making process; rather, the critical question was whether the report gave rise to rights, obligations, or legal consequences. *Id.* The Fourth Circuit agreed with the district court's conclusion that the report *itself* gave rise to no legal rights or obligations because it had no *direct* regulatory effect on the plaintiffs. *Id.* However, the district court had found that there were sufficient *indirect* consequences of the report to authorize treating the report as final agency action because the "emotionally charged nature of the debate over smoking and the general public's tendency to panic . . . unquestionably [would] have far-reaching consequences. *Id.* Therefore, the *Flue-Cured* court focused its attention on the narrow question of whether "agency action producing only coercive pressures on third parties is reviewable under the APA." *Id.* at 859.

Citing two analogous Supreme Court cases, the Fourth Circuit answered in the negative. *Id.* at 859-60. *See also Franklin v. Massachusetts*, 505 U.S. 788, 790 (1992) (holding that report submitted by Secretary of Commerce to the President regarding population statistics of the states for purposes of calculating of House of Representative seats was tentative, could not independently alter states' entitlements to representatives, and was not binding on the President, and thus was not reviewable final agency action); *Dalton v. Specter*, 511 U.S. 462, 466 (1994) (holding that base closure recommendations by the Secretary of Defense were not reviewable final agency action because the President was free to approve or disapprove the recommendations). Though finding that "[b]oth *Franklin* and *Dalton* involved agency recommendations which carried *persuasive* value with the President who was the final decision-maker," the Fourth Circuit nonetheless held that "the persuasive value and practical barriers associated with the agencies' recommendations were insufficient to create reviewable agency

14

action under the APA because the challenged agency actions, although they might have influenced the President's decision, did not *create* any legal rights, obligations, or consequences." *Id.* at 860 (emphasis added). Rather, the *Flue-Cured* court found that, like in *Franklin* and *Dalton*, the consequences complained of by the plaintiffs in *Flue-Cured* stemmed from independent actions taken by third parties, and that such third parties were:

> [F]ree to embrace or disregard the Report which is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities. . . . Likewise, while the Report's persuasive value may lead private groups to impose tobacco-related restrictions, these decisions are attributable to independent responses and choices of third parties. . . . Furthermore, as a practical matter and of considerable importance, if we were to adopt the position that agency actions producing only pressures on third parties were reviewable under the APA, then almost any agency policy or publication issued by the government would be subject to judicial review.

*Id.* at 860-61. Accordingly, the Fourth Circuit ultimately held that the EPA's report was not reviewable final agency action under the APA.[5]

Here, the Court is substantially guided by the Fourth Circuit's reasoning and conclusions in *Flue-Cured* and finds that decision to be directly on point. The potentially harmful report in question in both cases was submitted by a federal agency but statutorily proscribed from having any direct legal consequences of its own. Instead, at best, both the report in *Flue-Cured* and the NPDB report at issue in the instant case had the potential to adversely affect the plaintiffs based on an ability to influence third parties who were in a position to cause the plaintiffs harm. In *Flue-Cured*, the Fourth Circuit considered and explicitly rejected the plaintiff's argument that such potentially adverse effects, resulting from a report's coercive pressures on third parties, are enough to turn submission of a report into final agency action for purposes of judicial review. In

---

[5] Similarly, in *Invention Submission Corp. v. Rogan*, the Fourth Circuit found that adverse effects suffered as a result of an advertising campaign undertaken by an agency pursuant to statutory authority "was not a regulatory effect reviewable in court, but at most an indirect effect from third parties and market forces . . . 'properly challenged through the political process and not the courts.'" 357 F.3d 452 (4th Cir. 2004) (quoting *Flue-Cured*, 313 F.3d at 861).

this case, Plaintiff attempts to distinguish *Flue-Cured* by arguing that the VA's report, unlike the report in *Flue-Cured*, was directed at specific recipients rather than the general public. The Court is not persuaded that this distinction is material and Plaintiff has not provided any authority to the contrary. Accordingly, the Court finds no basis for deviating from the clearly articulated result in *Flue-Cured*.

Furthermore, Plaintiff has not shown that he has *actually* suffered any adverse effects. Defendants are correct to point out that, to the contrary, it actually appears that the VA knew of Plaintiff's involvement in the malpractice claim filed by C.L.'s estate and nevertheless chose to hire him again for another position. As such, any harm that might conceivably come to Plaintiff in the form of negative effects to his professional reputation appears to be merely speculative at this juncture.

Therefore, the Court finds that the VA's submission of the report, like the submission of the report by the EPA in *Flue-Cured*, was not an action by which rights and obligations have been determined and that accordingly, Plaintiff has not established that the VA's action in submitting the NPDB report was such an action.

In sum, since Plaintiff has failed to show both that submission of the NPDB report was the consummation of an agency decision-making process and that it was an action by which rights and obligations have been determined, the Court finds that Plaintiff has not established that there has been final agency action in this case. Though failure to carry the burden as to this factor precludes judicial review under the APA in and of itself, in the interest of completeness, the Court will now also briefly focus its attention on the second requirement for waiver of sovereign immunity and analyze the question of whether Plaintiff has shown that there is no other adequate judicial remedy.

16

Case 5:10-cv-00355-FL   Document 24   Filed 04/19/11   Page 16 of 19

### b. Other adequate judicial remedy

Defendants argue that, once Plaintiff has initiated a dispute with the DHHS over the accuracy of the report, the DHHS's ultimate resolution of that dispute will be subject to APA review and such review would serve as an adequate alternative judicial remedy.[6] In response, Plaintiff argues that a potential future procedure for him to request that the DHHS remove an inaccurate report is not an adequate remedy, because the DHHS "lacks judicial equitable power to fashion a remedy" and "has no power to declare that the VA has acted arbitrarily, capriciously, or unlawfully or wrongfully or to declare that the VA misapplied the statute, or to order them to stop acting illegally." Memo. in Opp'n at 10-11. Essentially, Plaintiff argues that any remedy that he would ultimately receive from the DHHS would be inferior to review in this Court. In their reply, Defendants cite *Leal v. DHHS*, 2010 WL 3667020, at *2 (11th Cir. Sept. 22, 2010), for the proposition that neither the DHHS or this Court will provide Plaintiff with the result that he seeks—a ruling that he did not render substandard care or a hearing on the issue—because both will limit themselves to determining whether there is evidence in the record to support the NPDB report.

At the outset, the Court notes that the parties appear to be arguing past each other on this point. Defendants contend that, once a DHHS decision is received, judicial review of it would constitute other adequate judicial remedy. Plaintiff does not dispute this assertion but instead contends that the DHHS review *itself* is not an adequate judicial remedy.

Plaintiff has not shown that there has been final agency action in this case in part because he has not yet received the DHHS's decision on the accuracy of the NPDB report submitted by

---

[6] Defendants also argue that Plaintiff has failed to exhaust the administrative remedies delineated in the HCQIA and that therefore the APA cannot apply to provide judicial review of the VA's submission of the NPDB report at this juncture. However, this argument overlaps in large part with Defendants' position as to consummation of the agency process, discussed in detail in Section 1.a.i, *supra*, and the Court need not revisit it here.

the VA. *See* Section 1.a, *supra*. Consequently, when Plaintiff does receive such a decision from the DHHS, he will be free to attempt to seek judicial review of it in this Court. Plaintiff has essentially conceded that such a review *would* constitute other adequate judicial remedy. To the extent Plaintiff is able to cure his current failure to carry the burden of showing that there has been final agency action, he will be able to seek review in this Court on the basis that there is no other adequate judicial remedy at that juncture. However, at the moment, Plaintiff cannot show that judicial review of *the VA's action* is the only adequate judicial remedy.[7] Accordingly, the Court finds that Plaintiff has not established that there is no other adequate judicial remedy in this case.

Plaintiff has failed to carry his burden of establishing both that there has been final agency action and that there is no other adequate judicial remedy in this case and, in fact, has shown neither. Accordingly, sovereign immunity has not been waived under the APA so as to authorize judicial review and, therefore, the Court recommends that Defendants' motion to dismiss for lack of subject matter jurisdiction be granted.

## 2. Standing to sue

A challenge to standing is properly considered a challenge to subject matter jurisdiction under Rule 12(b)(1). *See, e.g., White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). Defendants argue that Plaintiff has failed not only to allege facts which demonstrate that he has suffered or is in imminent danger of suffering an actual, concrete injury but also to establish that any such injury would be to an interest which is within the zone of interests to be protected by the HCQIA.

---

[7] Though the parties have argued at some length about the type of review that the judicial process could provide as opposed to the review that the DHHS would conduct, this disagreement misses the point and the Court need not address it here.

18

The question of whether an agency action is "final" precedes the constitutional inquiry into whether standing exists. *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008) (citing *Flue-Cured*, 313 F.3d at 857); *see also, e.g., Wollman v. Sec. of Army*, 603 F. Supp. 2d 879, 883 n.4 (E.D. Va. 2009). As a result, because the Court recommends that Defendants' motion to dismiss be granted due to Plaintiff's failure to establish waiver of sovereign immunity under the APA, the issue of Plaintiff's standing to sue need not be considered at this time.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendants' Motion to Dismiss [DE-20] be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 19th day of April, 2011.

DAVID W. DANIEL
United States Magistrate Judge